UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LL NJ, Inc. and LIFESTYLE
LIFT HOLDING COMPANY, Inc.,

Plaintiffs,

Case Number 06-14312
v.                                                          Honorable David M. Lawson

NBC - Subsidiary (WCAU-TV), L.P.,
NBC STATIONS MANAGEMENT II, Inc.,
NBC STATIONS MANAGEMENT, Inc.,
NBC UNIVERSAL, Inc., JOHN DOE 1,
JOHN DOE 2, and LU ANN CAHN,

Defendants.
_____/

## OPINION AND ORDER DENYING CROSS MOTIONS FOR SUMMARY JUDGMENT, DENYING IN PART PLAINTIFFS' MOTION TO MAINTAIN CERTAIN DOCUMENTS UNDER SEAL, AND ESTABLISHING CALENDAR DATES

The plaintiffs, LL NJ, Inc. and Lifestyle Lift Holding Company, Inc., are in the business of

preforming facelifts and other cosmetic surgery, with facilities located in several states, including

Michigan.  Defendant NBC-Subsidiary (WCAU-TV), L.P., an affiliate station of the National

Broadcasting Company (NBC), broadcast an exposé focusing on certain dissatisfied patients of the

plaintiffs at their clinic in Little Falls, New Jersey.  Immediately after the broadcast was aired, the

plaintiffs brought the present action asserting claims for (1) violation of the New Jersey Wiretapping

and Electronic Surveillance Control Act, (2) trespass to land, (3) violation of the Lanham Act, and

(4) defamation.  Only the defamation and trespass counts remain, and the defendants have moved

for summary judgment on those.  The plaintiffs in turn have moved for partial summary judgment

on the trespass count.  They also have filed a motion to maintain the confidentiality of certain

documents filed under seal.  The Court heard oral argument on the motions on October 4, 2007 and

now finds that fact questions preclude summary judgment on the defamation claim, and the trespass cause of action, which must be decided under New Jersey law, ought to be left for decision by the courts of New Jersey because there is scant authority available to guide this Court's decision. Therefore, the summary judgment motions will be denied, and the trespass claim will be dismissed without prejudice. A review of the documents the plaintiffs request to keep confidential convinces the Court that, with minor exceptions that can be addressed by redaction, only two pages of documents should remain under seal.

I.

The plaintiffs (collectively, "Lifestyle Lift") originally brought suit against defendants NBC affiliate WCAU-TV L.P. (a.k.a NBC 10), NBC Stations Management, Inc., NBC Stations Management II, Inc., NBC Universal, Inc., reporter Lu Ann Cahn, undercover agents Jane Doe I and Jane Doe II (collectively, the "NBC defendants"), and Dr. Louis Bucky on a variety of claims arising from a newscast critical of the Lifestyle Lift procedure.

After WCAU had broadcast a report that praised Lifestyle Lift, Cahn learned that some patients were not happy with the procedure. Thereafter, in 2006, Cahn and WCAU sent undercover operatives posing as prospective patients to a Lifestyle Lift clinic in Little Falls, New Jersey. The undercover agents recorded events in the clinic, but the recording was never publicly released. Nevertheless, on October 10, 2006, WCAU broadcast an investigative report conveying that the Lifestyle Lift procedure was not all it was cracked up to be. The plaintiffs immediately filed a complaint with this Court asserting the four claims mentioned above. The Court subsequently dismissed Dr. Bucky from the case for lack of personal jurisdiction and dismissed counts 1 (violation of the New Jersey wiretap statute) and 3 (Lanham Act) for failure to state a claim.

The discovery submitted with the present motions indicates that in August 2004, Philadelphia-based WCAU-TV (a.k.a NBC 10) broadcast a report that showed the benefits and virtues of the Lifestyle Lift facelift procedure. This publicity appears to have been welcomed by the plaintiffs, who had spent considerable resources promoting their procedures. The plaintiffs' business model is built on television advertising; they have acknowledged that they spent $10,000,000 on advertising over the last three years, and they have been featured in approximately 100 media broadcasts. The procedure was not without its critics, however. Between August 16, 2005 and March 15, 2006, three articles appeared in major newspapers discussing the pros and cons of the Lifestyle Lift procedure. In the latter half of 2006, WCAU's favorable coverage of the Lifestyle Lift procedure also changed.

In the summer of 2006, WCAU began compiling material for an investigative report that it would ultimately air in October 2006. According to lead reporter Lu Ann Cahn, WCAU decided to produce the story after it received independent "tips" from two women who were dissatisfied with the results of their surgeries. Cahn interviewed a number of former patients, including one of the tipsters, and WCAU sent two undercover agents to a Lifestyle Lift facility in Little Falls, New Jersey. One of the agents had a video camera and recorded activity inside the facility, including discussions with Lifestyle Lift representatives concerning the nature and quality of the procedure. Ms. Cahn also interviewed Dr. Louis Bucky, who opined that the Lifestyle Lift procedure was suspect and generally frowned upon in the medical community. The report also contained clips from Cahn's interview with Kent at his office in Troy, Michigan in September 2006 (which occurred after the interview with Bucky), and it juxtaposed statements by Kent with information that seemed to contradict those representations. Cahn informed Kent at the interview that she had sent some agents

into a Lifestyle Lift clinic, but she did not disclose that the agents had engaged in undercover recording. Cahn later called Dr. Kent and asked him if he would answer some more questions, but he denied the request. Kent apparently suspected that the agents had recorded material during their visit to the New Jersey clinic, and he asked Cahn if this had occurred. Cahn told him that it had, and Kent responded by saying that he planned to sue her.

In keeping with that promise, the plaintiffs commenced this action on September 29, 2006, and soon thereafter filed a motion for a temporary restraining order. In that motion, the plaintiffs sought to prevent the public disclosure of the undercover recording. The Court denied the motion, but as it turned out, the NBC defendants never broadcast the recording itself.

WCAU aired the report on October 10, 2006. The report was ten minutes long and generally painted an unfavorable picture of Lifestyle Lift and its business practices. A nearly verbatim transcript of the broadcast was originally posted on various local NBC websites.

Cahn opened the broadcast with the postulate that the Lifestyle Lift procedure is "sweeping the country." Women Upset With Facelift Results *at* http://www.nbcsandiego.com/health/ 10052581/detail.html (last visited April 3, 2008). She recounted the claims of the company's doctors that the procedure was quick and painless and then turned to two dissatisfied patients, whose results varied substantially from the company's advertised outcomes. Cahn observed that the company's advertisements failed to disclose the possibility of scar tissue, substantial pain, and many days of recovery.

Cahn went on to describe how NBC 10 had aired a report featuring the upside of Lifestyle Lift in 2004. Many of the laudatory patient comments and Dr. Kent's self promotion contained in that report were repeated to serve as contrast to the new findings. In the new broadcast, one woman

told investigators that she had to hide for two weeks because her head was "as big as a basketball." *Ibid.* She said she experienced a high-pressure sales pitch where the risks were severely understated. Cahn questioned Dr. Kent about the sales tactics used by Lifestlyle Lift, but he insisted that Lifestyle Lift personnel tell the truth. Cahn implied that this representation was undermined by Lifestyle Lift's offer to perform a "re-do surgery" free of charge on a patient who complained. *Ibid.* She also implied that the Lifestyle Lift procedure is inherently defective, as the patient receiving the second surgery was again dissatisfied with her results.

Cahn next turned to another disappointed patient. The patient explained that the doctor who performed the surgery was different than the doctor who initially consulted her. After the surgery, the patient reported looking the same, except for the addition of scarring. Cahn asked Kent about these results, and he conceded that the patient developed some scarring. However, Kent examined before and after photos and noted that he saw some improvement. Besides, Kent explained, the patients sign consent forms advising them of all the risks and not everyone gets the result they desire.

Not ready to take Kent's word for it, NBC 10 organized an undercover investigation, which Cahn described in some detail. One of the women, named Val, walked out of a clinic feeling uncomfortable with the intense sales pitch she received. Although the sales consultants make substantial commissions (between $150 and $250 for every surgery they secure) and are not doctors, Dr. Kent denied the accusation that they made "sales pitches." *Ibid.* In his view, the consultants are simply "educating the public." *Ibid.*

Cahn interviewed other patients who disagreed. As she described it, "[t]hese former patients say they did sign consent forms about the risks, but she that they were sold and what they were sold

they didn't get." *Ibid.* One of the patients captured on film described the process as follows: "They take your skin and roll it up and stick it behind your ear, which they tell you will be gone in two months." *Ibid.* However, she pointed to significant scarring that still persisted after one year and three months.

Another patient interviewed by NBC 10, Tamara Bollman, agreed to have her procedure filmed. Cahn reported that Bollman was happy with the results, but she found the pain and recovery time greater than represented. When Cahn questioned Dr. Kent about a commercial that stated patients could return to work the next day, Kent denied the commercial said that. He said the ads say patients can return to work "quickly," and Lifestyle Lift personnel actually tell patients to plan on taking a few days off. *Ibid.*

Returning to the undercover operation, Cahn described how NBC 10 sent Val and another woman named Ann Marie to a Lifestyle Lift clinic in Little Falls, New Jersey. Ann Marie reported that a consultant told her that the Lifestyle Lift produced the same results as a traditional face lift with less risk. Val stated that they were offered discounts, even though she found the sales pitch in New Jersey to be less intense than the one she received in Pennsylvania. On the other hand, Val and Ann Marie were told that the procedure would last seven to fifteen years, even though Dr. Kent stated it lasts five to ten years on average.

Cahn impeached Kent's credibility once more in terms of what patients are told by physicians. Kent told Cahn that, regardless of what consultants may say, the plastic surgeons review all the risks and determine whether the patient is a good candidate. However, Tamara Bollman told Cahn that she only met with the doctor on the day of the surgery, and she was not given a consent form until immediately before the procedure. Norma McClaughlin reported a similar experience.

Cahn then turned to its hired expert, Dr. Louis Bucky, a Philadelphia-based plastic surgeon. He reported that the Lifestyle Lift-type procedure was "basically discarded in the 1970s because it gives only temporary results." *Ibid.* Cahn showed Bucky the scarring on certain patients, and Bucky commented, "In 10 years of practice I've never seen keloid scars or sutures coming through. If this operation was real and truly worked than far more qualified physicians would all be doing that." *Ibid.* He described the procedure as one that simply doesn't work in the vast majority of cases, stating that it "might work fine for about 5% of patients." *Ibid.*

The broadcast closed with more comments from Dr. Kent, who discounted the criticism from others in the medical community with the defense that "other doctors just don't like the competition." *Ibid.* The story concluded with a comment from one of the women who said she would reconsider her decision to submit to the procedure, and an announcement that "Dr. Kent told us he would refund the money of the Philadelphia women who complained." *Ibid.*

The final broadcast contained interview clips of Drs. Kent and Bucky and of patients Norma McLaughlin and Tamara Bollman. The report also contained interview clips of Jackie M. and Ann T., the two unnamed Plymouth Meeting patients, and statements by the undercover agents, Valerie and Ann Marie. The undercover footage was not aired. It appears that the online version of the story was made available after August 2007 only on NBC's San Diego website, *see* Women Upset With Facelift Results *at* http://www.nbcsandiego.com/health/10052581/detail.html (last visited April 3, 2008), although it was originally posted on other sites, including WCAU's webpage. *See* Pls.' Resp. Br., Ex. 20, Transcript of Broadcast; *see also* http://www.nbc10.com/news /10046835/detail.html (stating that report has been removed).

On November 16, 2006, WCAU broadcast an additional report on Lifestyle Lift. The plaintiffs have not challenged that report, and the record sheds no light on its content.

As noted above, the Court has dismissed two of the plaintiffs' four counts in their amended complaint. In addition, the Court has ruled that the plaintiffs may not proceed on their defamation claim with respect to statements made in the trailers preceding the broadcast. Presently before the Court are the plaintiffs' claims for trespass and defamation against the NBC defendants.

There are six remaining statements that form the basis of the plaintiffs' defamation claim. All of these statements were published by the defendants in the October 10, 2006 broadcast. They are:

> (1) Cahn's statement that "[t]hese former patients say they did sign consent forms about the risks, but insist that they were sold and what they were sold they didn't get."

> (2) A former patient's statement that, during the operation, "[t]hey take your skin and roll it up and stick it behind your ear."

> (3) Dr. Bucky's statement that the Lifestyle Lift-type procedure was "basically discarded in the 1970s because it gives only temporary results."

> (4) Dr. Bucky's statement, "If this operation was real and truly worked then far more qualified physicians would all be doing that."

> (5) Dr. Bucky's statement that the procedure "might work fine for about 5% of patients."

> (6) Dr. Bucky's statement, "In 10 years of practice I've never seen keloid scars or sutures coming through."

Pls.' Resp. to Mot. for Summ. J. at 14-16 (quoting broadcast).

Following a series of discovery disputes, the parties filed the present motions for summary judgment. The defendants move for summary judgment on both the trespass and defamation claims, while the plaintiffs move for summary judgment on the trespass claim only. Both sides have

submitted voluminous exhibits in support of their respective positions, although most of the material deals with the defamation claim.

The defendants have submitted substantial evidence to support their assertions that Lifestyle Lift is a limited-purpose public figure, the statements at issue were not false, and the defendants did not act with malice. To establish that Lifestyle Lift is a limited-purpose public figure, the defendants point to evidence of the company's advertising efforts and the existence of a controversy surrounding the facelift procedure that pre-dated the October 2006 broadcast.

The evidence shows that Lifestyle Lift has, since its inception in 2003, performed 70,000 facelift procedures at an average price of $3,800 to $4,000 per operation. The procedure is advertised as a one-hour operation that requires only local anesthesia. In past media appearances, Dr. Kent has described the procedure as involving a "small incision" in front of and behind the ear, which allows the physician to access and lift muscle under the facial skin and secure it with several sutures. Defs.' Mot. for Summ J., Ex. B at Fox 26 Broadcast. Kent has further explained that the physician then trims the excess facial skin and stitches the incision line. On another broadcast, Kent stated that the procedure involves "minimal swelling and bruising," allows patients to return to work the next day, and provides results that can last as long as a traditional facelift. Ex. P at NBC Broadcast. However, it appears that Lifestyle Lift has retreated somewhat on those claims, as the website states that patients "[u]sually . . . can return to work . . . in about a week." About the Procedure at http://www.lifestylelift.com/AboutTheProcedure.htm (last visited August 3, 2007).

In the past three years, 98% of the approximately $10,000,000 the plaintiffs spent on advertising was devoted to television advertising. The plaintiffs' advertising agency is Kent Creative Group, Inc., of which Dr. David Kent is the director and sole shareholder. Michael Smith,

vice-president of Kent Creative Group, Inc., testified that Lifestyle Lift contacts local news stations and newspapers to solicit media coverage. Dr. Kent estimates that Lifestyle Lift has been featured in 100 broadcasts. To leverage this publicity, Lifestyle Lift purchased additional advertising slots after the newscasts.

According to Marc Belanger, the Senior VP of Customer Experience for LSJ Marketing, once interest has been generated through television, Lifestyle Lift's business model engages a large call center in Troy, Michigan. Prospective clients call a toll-free telephone number and speak with one of seventy call center representatives. The representatives provide basic information about the procedure and set up consultations at the local clinics. The majority of these representatives are paid on a commission basis.

Kenneth Field, the plaintiffs' physician liaison, testified that when a prospective patient arrives at a Lifestyle Lift office, she meets with a consultant. Most of the consultants have sales experience, but no medical training. Kelli Young, another marketing employee, testified that consultants receive a base salary enhanced through commissions paid out when patients undergo surgery. According to Young and Dr. Kent, although consultants provide patients with general information concerning the procedure, patients generally do not receive the informed consent form until shortly before the surgery begins.

It appears that Lifestyle Lift advances its business through the use of a relatively strict quota system at each stage of the process. Call center representatives are expected to schedule a minimum of 200 consultations per week, and each consultant is expected to complete fifteen sales per week, for a total of thirty surgeries per week per facility (given two consultants at each facility).

Prior to the October 10, 2006 report, Lifestyle Lift was already the subject of some controversy. For instance, the March 15, 2006 edition of *The Boston Herald* contained an article discussing the growth of the mini-lift industry and its pros and cons. That article told the story of Ron Desrosiers, a man so disappointed with the Lifestyle Lift procedure that he demanded part of his money back. Similar articles appeared in *The Detroit News* (December 5, 2005) and *The Detroit Free Press* (August 16, 2005). Dr. Jeffrey Colton, a physician who has been with Lifestyle Lift since its inception, also testified that the procedure was contested within the medical community. In addition, many patients had publicly complained about Lifestyle Lift prior to the broadcast. Critical messages were posted on public internet chat forums, and, at the time of the broadcast, Lifestyle Lift had an unsatisfactory record with many of the Better Business Bureau chapters of which it was a member. Further, prior to the defendants' broadcast, the National Advertising Division (NAD) began investigating Lifestyle Lift's advertising practices. Although the investigation was not a matter of public knowledge at the time of the broadcast, the NAD recently released its findings and concluded that one of the statements made by Lifestyle Lift in prior advertising materials was substantially misleading. The subject statement was a claim by Lifestyle Lift that "Results are immediate, return to work quickly looking like you did up to 20 years ago!" Defs.' Mot. for Summ. J., Ex. W, NAD Report at 1. Although Lifestyle Lift had voluntarily discontinued the statement prior to both the broadcast and the NAD investigation, Lifestyle Lift did not agree to a *permanent* discontinuance.

The defendants have also submitted substantial evidence in an effort to show that the statements at issue were not false and the report was not broadcast with actual malice. Initially, the defendants point to the origin of the broadcast as demonstrating that it was a genuine news-story,

and not simply the brainchild of a desperate reporter. Cahn testified that in the summer of 2006, WCAU received information from two separate viewers (Jackie M. and Ann T.) expressing dissatisfaction with the Lifestyle Lift. Shortly thereafter, a third woman (Norma McLaughlin) called with a similar complaint. Ann T. complained that she did not get the result she wanted and had a visible scar. Jackie M. complained of a keloid scar around her ear and a suture coming through her skin. Norma complained about scarring and a condition known as "pixie ears." Cahn said she decided to investigate further because she had never received multiple complaints about the same procedure in such rapid succession.

Cahn testified that her investigation began in mid-August and lasted almost seven weeks. Her investigation included researching publicly available information concerning Lifestyle Lift; interviewing the three complainers, Jackie M., Ann T., and Norma M., about their respective experiences with Lifestyle Lift; reviewing Ann T.'s "before and after" photos; contacting one of the patients who had previously appeared in a "positive" broadcast about Lifestyle Lift and learning that she was still satisfied and did not want to appear on camera again; attempting to contact another satisfied Lifestyle Lift patient who had previously appeared on a WCAU broadcast; flying to Troy, Michigan to interview Dr. Kent and film the Lifestyle Lift procedure performed on Tamara Bollman; interviewing Tamara Bollman and another Lifestyle Lift patient that Dr. Kent approved for the task during Cahn's visit to Kent's office; filming the surgery of Tamara Bollman with Dr. Kent's permission and interviewing her again well after the fact; speaking briefly off-camera with a number of other satisfied Lifestyle Lift patients at the Troy clinic; attempting to contact the three doctors who had performed the surgeries of the dissatisfied patients appearing on the broadcast, and speaking briefly with one of them; interviewing Dr. Louis Bucky (a board-certified plastic surgeon),

who is a professor at the University of Pennsylvania School of Medicine and President of the Northeastern Society of Plastic Surgeons; speaking off-the-record with multiple doctors who stated that the procedure was not generally done and who had nothing positive to say about the Lifestyle Lift; sending in undercover agents to the Lifestyle Lift clinic in Little Falls, New Jersey to determine what type of information was actually provided to patients during consultations; and requesting (unsuccessfully) a follow-up interview with Dr. Kent. In conducting her investigation, however, Cahn did not read any medical literature.

Before the report was aired, it was reviewed by Cahn, WCAU's news director (Christopher Blackman), and WCAU's general manager (Dennis Bianchi). All three testified that they had no reason to believe that anything contained in the report was untrue. However, the report was screened by WCAU's lawyers, a process which WCAU undertakes only with respect to certain, sensitive broadcasts.

The plaintiffs have responded with their own voluminous set of documents. The plaintiffs do not disagree with the defendants' characterization of their basic business model and the chronology leading up to surgery. They concede they do substantial advertising through television, and they confirm the roles played by call center representatives and consultants. The plaintiffs insist that it is Lifestyle Lift's policy to encourage doctors to meet with patients around two weeks before the surgery, although they acknowledge that some doctors do not follow this protocol. Dr. Kent has acknowledged that the patient reviews and signs the informed consent form on the day of the surgery.

More importantly, the plaintiffs have submitted substantial evidence to show that the Lifestyle Lift procedure is a legitimate procedure performed by legitimate doctors. This evidence is offered to demonstrate that the defamatory statements were in fact untrue.

Dr. Kent has described the nature of the procedure (which is undisputed) as a two-layer process known as an SMAS (superficial muscular aponeurotic system) that adjusts the skin and the musculature that underlies it. He characterized it as a "standard face-lifting technique used by itself or in combination with other procedures." Resp. Br., Ex. 1, Kent Aff. at ¶ 10-11. He further states that "[o]ne would be in error to confuse [the Lifestyle Lift] with a subcutaneous or 'skin only' facelift (1-layer lift) which has essentially been discarded." *Id.* at ¶ 13.

According to Dr. Kent, Lifestyle Lift doctors have performed over 70,000 such procedures, and "the SMAS-plication facelift is the most widely performed type of facelift today." *Id.* at ¶ 11. He opines that the Lifestyle Lift is a "generally accepted facelifting technique, which truly works for a great majority of patients, in that it generally improves the appearance of patients . . . and reduces the signs of facial aging." *Id.* at ¶ 12. The notion that the Lifestyle Lift procedure is generally accepted in the medical community is confirmed by the testimony of Drs. Jeffrey J. Colton, Shan Baker, and R. James Koch, all qualified plastic surgeons. Kent says that the effects of the Lifestyle Lift usually last five to ten years, but in some cases they may last fifteen years or even a lifetime.

Turning to the six statements at issue in this case, Kent claims that during his interview with Cahn, he advised her of facts demonstrating the falsity of those statements. With respect to the first statement, Kent claims in his affidavit that he told Cahn that each of the patients executed informed consent forms advising them of the risks and benefits of the procedure, and they received a surgery

consistent with that disclosure; patients signed these forms before undergoing the procedure, so she knew the patients received what they were sold; and there was no truth to the allegation that the Lifestyle Lift involved rolling the skin up behind the ear (which Cahn confirmed when she saw the procedure performed). Kent averred that there was no merit to Dr. Bucky's statement that the Lifestyle Lift is a procedure that was discarded in the 1970s because it gives only temporary results. During his interview, Kent explained to Cahn that the Lifestyle Lift is a generally accepted medical procedure performed by numerous surgeons and it produces results lasting five to ten years. He says he explained to Cahn that the vast majority of patients see positive results and the medical credentials required of Lifestyle Lift doctors are extensive. Kent believes the Lifestyle Lift is appropriate for all patients who have the procedure, and he told this to Cahn. Finally, Kent says that he informed Cahn that keloid scars can happen even with the best surgeon, and she therefore knew that Bucky's comment amounted to a false implication.

According to Dr. Kent, Lifestyle Lift only employs facial plastic surgeons, plastic surgeons, and otolaryngologists with specialized training in facial plastic surgery. All of the doctors associated with Lifestyle Lift are either board-certified or eligible for board-certification in one of these three fields. Dr. Shan Baker, one of the defense experts in this case, has testified that he does not question the qualifications of the Lifestyle Lift physicians.

The plaintiffs have also submitted a copy of the informed consent form given to Lifestyle Lift patients. Although there is some dispute over the extent to which the form was reviewed with patients, it is uncontested that all patients signed the form. Cahn also testified that she saw the form prior to the broadcast. The informed consent form signed by the patients featured in the report is approximately three pages long, and it discloses many of the risks and limitations of the Lifestyle

Lift procedure, including notification that patients "will have a scar." Resp. Br., Ex. 1-F-1, Informed Consent Form Signed by Ann T. at 1. It further provides that the procedure "is not a full facelift or neck lift" and indicates that "major changes to the neck and mid-face may not be possible." *Ibid.* The form lists the following as "normal symptoms" that occur during the recovery period: swelling and bruising, discomfort, itching, and redness of scars. *Ibid.* The form also discloses that, in a limited number of cases, bleeding, infection, nerve injury, and allergic reaction may occur. *Id.* at 2. With respect to scarring, unsatisfactory results, and the longevity of the procedure, the form provides as follows:

> **Scarring**- You will have a scar. Although good wound healing after a surgical procedure is expected, abnormal scars may occur within the skin and deeper tissues. Scars may be unattractive and of different color than the surrounding skin. There is the possibility of visible marks from sutures. Additional treatments may be needed to treat scarring. Thick, wide or depressed scars or keloids can occur and may require injections or more surgery or steroid shots; these may not improve. Your earlobes may be pulled or stretched after surgery.

> . . . .

> **Unsatisfactory Result** - There is the possibility of a poor result from the *Lifestyle Lift*™ surgery. This would include risks such as unacceptable visible deformities, loss of facial movement, wound disruption, and loss of sensation. You may be disappointed with the results of surgery. You may need additional surgery. The surgery may not improve your appearance.

> **Long Term Effects -** Subsequent alterations to facial appearance may occur as the result of aging, weight loss or gain, sun exposure, or other circumstances not related to *Lifestyle Lift*™ surgery. *Lifestyle Lift*™ surgery does not arrest the aging process: future surgery or other treatments may be necessary to maintain the results of a *Lifestyle Lift*™ operation.

*Id.* at 2-3.

Turning to the undercover recording, the plaintiffs point to the anti-recording provision signed by Cahn's undercover agents. As it turns out, after the agents had signed the forms, the

agents walked back out and Ann Marie informed Cahn of the situation.  Cahn spoke with legal

counsel about the matter, and she decided that the agents should continue to record despite the

agreement.  The anti-recording agreement reads as follows:

### POLICY REGARDING RECORDING DEVICES

At Lifestyle Lift™, we value your privacy.  In order to protect the privacy of our
patients it is the policy of this office to prohibit the use of sound, video and other
electronic recording devices, including cell phone cameras.  The use of such devices
is a violation of the right to privacy of both our patients and employees.  By signing
below, patient agrees that such conduct is an invasion of privacy of others and will
refrain from using recording devices on Lifestyle Lift™ center premises.

<div align="right">Agreed and acknowledged</div>

_____                    _____
Witness                                                       Patient

Dated:

Resp. Br., Ex. 17, Anti-recording agreement.

The plaintiffs have also offered the deposition testimony of David Bentley, a cameraman for

WCAU, who was on-scene during the surreptitious recording and placed cameras in the purses of

the undercover reporters, Ann Marie and Valerie.  His testimony clarifies that although Ann Marie

and Valerie both signed anti-recording agreements, only Ann Marie took her purse back in after they

had emerged to discuss this development with Cahn.

The defendants contend that they are entitled to a judgment of dismissal as a matter of law

on both the defamation and trespass counts.  The plaintiffs argue that fact questions preclude

summary judgment on the defamation count, and they believe the undisputed facts entitle them to

a judgment as a matter of law as to liability on the trespass count.

## II.

A motion for summary judgment under Fed. R. Civ. P. 56 presumes the absence of a genuine issue of material fact for trial. The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (internal quotes omitted).

A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics and Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248). Irrelevant or unnecessary factual disputes do not create genuine issues of material fact. *St. Francis Health Care Centre v. Shalala*, 205 F.3d 937, 943 (6th Cir. 2000). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Michigan Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 534 (6th Cir. 2002). Thus a factual dispute which "is merely colorable or is not significantly probative" will not defeat a motion for summary judgment which is properly supported. *Kraft v. United States*, 991

F.2d 292, 296 (6th Cir. 1993); *see also Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am. v. BVR Liquidating, Inc.*, 190 F.3d 768, 772 (6th Cir. 1999).

The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record which demonstrate the absence of a genuine dispute over material facts. *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002). The party opposing the motion then may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. If the non-moving party, after sufficient opportunity for discovery, is unable to meet his or her burden of proof, summary judgment is clearly proper. *Celotex Corp.*, 477 U.S. at 322-23.

The party who bears the burden of proof must present a jury question as to each element of the claim. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991). "[T]he party opposing the summary judgment motion must 'do more than simply show that there is some "metaphysical doubt as to the material facts."'" *Highland Capital, Inc. v. Franklin Nat. Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 800 (6th Cir. 1994), and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "Thus, the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there

must be evidence on which the jury could reasonably find for the plaintiff." *Ibid.* (quoting *Anderson*, 477 U.S. at 252) (internal quote marks omitted).

<center>A.</center>

This lawsuit was brought in a federal court in Michigan, although the conduct that gives rise to the trespass claim occurred at the plaintiffs' clinic in Little Falls, New Jersey, and the allegedly defamatory statements were first published in Philadelphia, Pennsylvania. As a result, the Court must determine which state's laws furnish the rules for decision. The analysis for the defamation count is different than for the trespass count.

<center>1.</center>

Resolution of the choice-of-law question for the defamation claim is an easy matter because the law of the forum (Michigan) is nearly identical with the law of the site of the tort (Pennsylvania). *Compare Mitan v. Campbell*, 474 Mich. 21, 24, 706 N.W.2d 420, 421 (2005) (stating that "[t]he elements of a defamation claim are: (1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication"), *with Moore v. Cobb-Nettleton*, 889 A.2d 1262, 1267, 2005 Pa. Super. 426 (Penn. Superior Ct. 2005) ("In a defamation case, a plaintiff must prove: (1) the defamatory character of the communication; (2) its publication by the defendant; (3) its application to the plaintiff; (4) the understanding by the recipient of its defamatory meaning; (5) the understanding by the recipient of it as intended to be applied to the plaintiff; (6) special harm resulting to the plaintiff from its publication; and (7) abuse of a conditionally privileged occasion.") (internal quotation marks omitted). Therefore, the Court will

<center>-20-</center>

apply the law of the forum – Michigan law – to decide the defamation claim. *See Williams v. Toys R Us*, 138 Fed. Appx. 798, 803 (6th Cir. 2005) ("Because there is no conflict of laws (indeed this is a false conflict situation), we therefore conclude that the district court did not err in applying Michigan state law in this case.").

<div align="center">2.</div>

The choice-of-law issue on the trespass claim is not so easily resolved. Under Michigan law, it appears that the viability of the plaintiffs' trespass cause of action may be in doubt, *see American Transmission, Inc. v. Channel 7 of Detroit, Inc.*, 239 Mich. App. 695, 708, 609 N.W.2d 607, 614 (2000) (relying upon *Desnick v. ABC, Inc.*, 44 F.3d 1345, 1351-53 (7th Cir. 1995)), whereas New Jersey courts have not yet addressed the issue.

A federal court sitting in diversity faced with a choice-of-law issue applies the choice-of-law rules of the forum state. *Klaxon Co. v. Senator Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Under Michigan's choice-of-law rules concerning tort claims, there is a presumption that Michigan law applies unless there is a rational reason to displace it. *Sutherland v. Kennington Truck Serv., Ltd.*, 454 Mich. 274, 286, 562 N.W.2d 466, 471 (1997). To determine whether there is a rational reason for displacement, Michigan courts use two-step analysis:

> First, we must determine if any foreign state has an interest in having its law applied. If no state has such an interest, the presumption that Michigan law will apply cannot be overcome. If a foreign state does have an interest in having its law applied, we must then determine if Michigan's interests mandate that Michigan law be applied, despite the foreign interests.

*Ibid*. Under this test, "Michigan courts . . . use another state's law where the other state has a significant interest and Michigan has only a minimal interest in the matter." *Hall v. General Motors Corp.*, 229 Mich. App. 580, 585, 582 N.W.2d 866, 868 (1998). This "interests analysis" is to be

distinguished from the traditional (and discarded) approach in Michigan, known as the doctrine of *lex loci delicti*, which dictated that the law to be applied was the law of the state where the tort occurred. *Sutherland*, 454 Mich. at 283-84, 562 N.W.2d at 470.

Trespass cases litigated outside the state where the trespass took place are rare indeed, and the Court finds no Michigan precedent that is factually similar. However, two other decisions shed light on the circumstances under which a "rational reason" to displace Michigan law will be said to exist. In both cases, the foreign state's laws included a statute of repose that would have barred the claim, which would have survived under Michigan law. In *Farrell v. Ford Motor Co.*, 199 Mich. App. 81, 501 N.W. 2d 567 (1993), the Michigan Court of Appeals held that North Carolina law applied to a defective automobile action involving a North Carolina plaintiff, a North Carolina accident, and a vehicle purchased in North Carolina, even though the defendant corporation was based in Michigan. Significant to the court's conclusion was its finding that North Carolina had a substantial economic interest in extending to Ford and other manufacturers doing business there the benefit of its statute of repose, which limited exposure to "open-ended" products liability claims. *See id.* at 572. Michigan, the court found, was "merely the forum state and situs of defendant's headquarters." *Ibid.* The court reached a similar result in *Hall v. Gen. Motors Corp.*, 229 Mich. App. 580, 582 N.W.2d 866 (Mich. App. 1998), another case involving an injury that occurred in North Carolina due to a defective auto part. Although Michigan arguably had a greater interest in having its law applied than in *Farrell* because Hall was a citizen of Michigan when he brought suit, the court held that this factor was insignificant in light of that fact that the injury occurred in North Carolina and the plaintiff was a citizen of that state at that time.

These decisions lead ineluctably to the conclusion that Michigan's choice-of-law rules favor application of New Jersey law to the trespass claim. Michigan has no real interest in this claim or the facts underlying it. The alleged trespass took place in New Jersey, and any harm that did occur happened there. Unlike the alleged defamatory report, which contained footage filmed in Michigan and which was published via the Internet and therefore accessible to Michigan viewers, the undercover footage was never publicly disclosed. Moreover, the individuals involved in the undercover operation were citizens of either New Jersey or Pennsylvania, not Michigan. The only interest that Michigan can claim with respect to the trespass count stems from the fact that the plaintiffs, LL NJ, Inc. and Lifestyle Lift Holding Company, Inc., are Michigan corporations. However, as the decisions in *Ferrell* and *Hall* make clear, that alone is an insufficient basis upon which to apply Michigan law. *Ferrell*, 199 Mich. App. at 94; *Hall*, 229 Mich. App. at 587. Because New Jersey has a significant interest in having its laws applied, and Michigan's interest is negligible, there is a rational reason to displace Michigan law and apply New Jersey law in its stead.

But New Jersey law provides little guidance on the question whether fraud can vitiate a landowner's consent to permit a person to enter his land, thereby resulting in a trespass. Under New Jersey law, trespass to land is an unauthorized entry by someone or something onto the real property of another. *Harvard Indus. Inc. v. Aetna Ins. Cas & Sur. Co.*, 273 N.J. Super. 467, 479, 642 A.2d 438, 444 (Super. Ct. Law Div. 1993), *disagreed with on other grounds by United States Bronze Powders, Inc., v. Commerce and Indus. Ins. Co.*, 293 N.J. Super. 12, 679 A.2d 674 (Super. Ct. App. Div. 1996). "Any entry or breach of [one's land] is a trespass and is actionable even if the damage is not appreciable." *Ibid.* What is an "unauthorized entry"? On that point, New Jersey courts have little to say, and the law cited by the parties is not particularly unhelpful.

The plaintiffs rely on N.J. Stat. § 2C:18-3, which states:

a. Unlicensed entry of structures. A person commits an offense if, knowing that he is not licensed or privileged to do so, he enters or surreptitiously remains in any research facility, structure, or separately secured or occupied portion thereof. . . .

b. Defiant trespasser. A person commits a petty disorderly persons offense if, knowing that he is not licensed or privileged to do so, he enters or remains in any place as to which notice against trespass is given by:
(1) Actual communication to the actor; or
(2) Posting in a manner prescribed by law or reasonably likely to come to the attention of intruders; or
(3) Fencing or other enclosure manifestly designed to exclude intruders.

N.J. Stat. § 2C:18-3(a), (b). This statute plainly deals with criminal trespass and makes no reference to entry obtained by false pretenses. *See also State v. Pierce*, 175 N.J. Super. 149, 417 A.2d 1085 (Super. Ct. Law Div. 1980) (discussing basic purpose of the criminal trespass statute).

The three New Jersey cases cited by the parties, *Uston v. Resorts Int'l Hotel, Inc.*, 89 N.J. 163, 445 A.2d 370 (N.J. 1982), *In re Schuman*, 114 N.J. 14, 552 A.2d 602 (N.J. 1989), and *Turf Lawnmower Repair v. Bergen Record Corp.*, 139 N.J. 392, 655 A.2d 417 (N.J. 1995), also fail to shed much light on the issue at hand. In *Uston*, the Supreme Court of New Jersey held that a casino did not have the right to exclude a patron based on his "card counting" method of playing blackjack. The decision did not discuss principles of trespass law; rather, the court held that the New Jersey Casino Control Act, N.J. Stat. § 5:12-1 *et seq.*, gave the Casino Control Commission the authority to set rules for gaming and therefore precluded the casino from excluding a patron based on card counting where the Commission had not banned card counting under its rules. The court mentioned the absence of a common law right to exclude patrons, *Uston*, 445 A.2d at 375 (noting that "when property owners open their premises to the general public in the pursuit of their own property interests, they have no right to exclude people unreasonably"), but allowed that a person could be

ejected if his behavior threatens to "disrupt the regular and essential operations of the premises" or jeopardizes the safety of the premises and its occupants, *ibid.* (internal quotations and alterations omitted). The Court finds no guidance in this case on the issue of entry in violation of an express condition imposed by the landowner.

The defendants have cited *In re Schuman* and *Turf Lawnmower Repair v. Bergen Record Corp.* for the proposition that New Jersey law is highly protective of news-gathering activity and therefore unlikely to condemn the defendants' conduct in this case. As the defendants' generalization suggests, both cases are factually inapposite and provide no legal rules that can be applied to the present action. *Schuman* concerned a court's authority to compel testimony from a reporter and was decided under the New Jersey Shield Act, N.J. Stat. § 2A:84A-21. *In re Schuman*, 655 A.2d at 607. *Turf Lawnmower Repair* is similar to this case in that it involved two news articles that exposed a scam lawnmower-repair shop, and news reporters posing as customers had been used to verify the rumors of fraud. However, the plaintiff in that case never sued for trespass. *Turf Lawnmower Repair*, 655 A.2d at 421.

There are decisions from other jurisdictions, including Michigan, that favor the defendants' position. For instance, the Seventh Circuit's discussion of covert reporting in *Desnick v. ABC* attempted to isolate the interests protected by the law of trespass and determine if they were compromised by reporters posing as patients at a medical clinic, fully acknowledging that on occasion the law recognizes consent to otherwise tortious conduct even though it is procured by fraud. The court there concluded that the tort of trespass protects the "inviolability of [a] person's property," which was not transgressed when the reporters in that case obtained entry by misrepresenting their intentions. *Desnick*, 44 F.3d at 1352. The court explained:

How to distinguish the two classes of case – the seducer from the medical impersonator, the restaurant critic from the meter-reader impersonator? The answer can have nothing to do with fraud; there is fraud in all the cases. It has to do with the interest that the torts in question, battery and trespass, protect. The one protects the inviolability of the person, the other the inviolability of the person's property. The woman who is seduced wants to have sex with her seducer, and the restaurant owner wants to have customers. The woman who is victimized by the medical impersonator has no desire to have sex with her doctor; she wants medical treatment. And the homeowner victimized by the phony meter reader does not want strangers in his house unless they have authorized service functions. The dealer's objection to the customer who claims falsely to have a lower price from a competing dealer is not to the physical presence of the customer, but to the fraud that he is trying to perpetuate. The lines are not bright – they are not even inevitable. They are the traces of the old forms of action, which have resulted in a multitude of artificial distinctions in modern law. But that is nothing new.

*Id.* at 1351-53. The court then observed that the eye clinic in that case wanted patients, and although the reporters did not disclose their intention to videotape their conversations, they did not reveal embarrassing private facts, and they did not disrupt the office business. As a result, the court found no interference with the possession or ownership of the plaintiff's land, which, of course, is the interest protected by the law of trespass. The court noted, however, that it "need not consider what if any difference it would make if the plaintiffs had festooned the premises with signs forbidding the entry of testers or other snoops. Perhaps none, *see United States v. Centennial Builders, Inc.,* 747 F.2d 678, 683 (11th Cir.1984), but that is an issue for another day." *Desnick*, 44 F.3d at 1353.

The Michigan Court of Appeals adopted the rationale of *Desnick* in *American Transmission, Inc. v. Channel 7 of Detroit, Inc.*. However, although *American Transmission* also implies that the plaintiffs' action would likely fail if Michigan law applied, it must be acknowledged that the court there confronted a different situation: the undercover reporter in *American Transmission* did not misrepresent her intent with respect to surreptitious recording. *See American Transmission*, 239 Mich. App. at 696-98, 609 N.W.2d at 609-10. Rather, the undercover reporter simply posed as a

consumer seeking help with her transmission. Little did the plaintiff auto shop know that she was equipped with a concealed camera, but she did not represent otherwise.

Both *American Transmission* and *Desnick* are well reasoned, but each is readily distinguishable from the alleged intrusion at the facelift clinic, and neither establishes conclusively a prevailing rule that an action for trespass could not be maintained under the facts of the present case. In the present case, there was affirmative misrepresentation and a violation of a written agreement. Even in *Desnick*, although the reporter in that case stated there would be no undercover recording, the individuals doing the recording themselves never engaged in that affirmative misrepresentation. And, more significantly, the present case contains the feature of Lifestyle Lift's requiring every visitor to sign an anti-recording agreement as a condition of entry into the clinic. Moreover, the Fourth Circuit's decision in *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505 (4th Cir. 1999), cuts in the other direction. There, although the court approved of *Desnick*'s analysis, it upheld a jury's verdict finding trespass where reporters, after using false resumes to get jobs, filmed in non-public areas in connection with an investigative report. *Id.* at 518. The *Food Lion* court also declared that "the various jurisdictions and authorities in this country are not of one mind in dealing with the issue." *Id.* at 517. *See also Schiffman v. Empire Blue Cross and Blue Shield*, 256 A.D.2d 131, 681 N.Y.S.2d 511 (App. Div. 1998) (holding that reporter who gained entry to medical clinic by posing as patient could not assert consent as defense to trespass claim "since consent obtained by misrepresentation or fraud is invalid")

Whether the features that distinguish this case from *Desnick* and *American Transmission* would persuade the New Jersey courts that the trespass claim ought to proceed, or whether New

Jersey would reject the premise of those cases in favor of *Food Lion* or *Schiffman*, is not signaled by the State's jurisprudence. It is more a matter of guesswork.

The defendant suggest that the solution to this puzzlement is to certify the question to the New Jersey Supreme Court. Certainly, certification of a legal question is "most appropriate when the question is new and state law is unsettled." *Transamerica Ins. Co. v. Duro Bag Mfg. Co.*, 50 F.3d 370, 372 (6th Cir. 1995) (citing *Lehman Bros. v. Schein*, 416 U.S. 386, 391 (1974)). But federal statutory law does not provide a procedure for district courts to certify legal questions to state courts. Rather, federal courts utilize the certification procedures designated by state law. *See Lehman Bros. v. Schein*, 416 U.S. 386, 389-90 (1974).

Under New Jersey law, there is no procedure by which this Court may certify a question to a state tribunal. Pursuant to New Jersey Rule of Court 2:12A-1, which was provisionally introduced in 2000 and made permanent in 2003, only the United States Court of Appeals for the Third Circuit has that option. N.J. Rule of Ct. 2:12A-1 (providing that "[t]he Supreme Court may answer a question of law certified to it by the United States Court of Appeals for the Third Circuit, if the answer may be determinative of an issue in litigation pending in the Third Circuit and there is no controlling appellate decision, constitutional provision, or statute in this State"). *See also Delta Funding Corp. v. Harris*, 426 F.3d 671 (2005).

Given the absence of New Jersey precedent on the present question, and lacking a procedure to seek the guidance of the state court, the Court is left with few options. The Supreme Court has counseled that "when state law does not make the certification procedure available, a federal court not infrequently will stay its hand, remitting the parties to the state court to resolve the controlling state law." *Lehman Bros.*, 416 U.S. at 390. Nevertheless, "mere difficulty in ascertaining local law

is no excuse for remitting the parties to a state tribunal for the start of another lawsuit." *Ibid. See also Meredith v. City of Winter Haven*, 320 U.S. 228, 234-35 (1943) (stating that, barring exceptional circumstances, punting on an issue of state law "merely because the answers to the questions of state law are difficult or uncertain or have not yet been given by the highest court of the state, would thwart the purpose of [diversity jurisdiction]").

The Court believes there are good reasons for abstaining from deciding the issue presented by the plaintiffs' trespass claim, the foremost of which is that the Court would be engaging in little more than guesswork were it to predict the New Jersey Supreme Court's position on a claim for trespass under these circumstances. The circumstances would be different if, although there were no New Jersey law on the question, every other jurisdiction had determined that a trespass does not occur when entry is obtained by affirmative misrepresentation, and it could be predicted that New Jersey would follow the pack. However, as noted above, the leading cases favoring the defendants in the area are readily distinguished, and there is no clear majority rule on the subject of fraud vitiating consent to entry upon land. So not only is there no New Jersey law on the issue, but guidance from other jurisdictions is uneven as well.

The Supreme Court has made it exceedingly clear that "mere difficulty in ascertaining local law" does not justify abstention in a diversity case. *Lehman Bros*, 416 U.S. at 390; *accord Meredith*, 320 U.S. at 234-35; *see also* Wright, Miller, & Cooper, Federal Practice and Procedure § 4246 (2d ed.). This of course makes sense because diversity jurisdiction, by its very nature, requires federal courts to decide matters of state law. *See Meredith*, 320 U.S. at 234, 237. However, there is a difference between trouble in ascertaining state law "because the answers to the questions of state law are difficult or uncertain or have not yet been given by the highest court of the state," *Meredith*,

320 U.S. at 234-35, and deciding a question of state law when there is virtually no guidance from the state courts whatsoever. With this distinction in mind, some courts have abstained when the question of state law is particularly obscure and certification is not available. *See, e.g., 3307 M. Street Partners v. Commonwealth Land Title Ins. Co.*, 782 F. Supp. 4, 7 (D.D.C. 1992) ("Because there are important questions of law, which the local court should decide in the first instance, and because the certification process is not the appropriate vehicle for securing such a determination, this case shall be dismissed without prejudice to renew in the Superior Court of the District of Columbia."); *see also* Wright, Miller & Cooper, Federal Practice and Procedure § 4246 n.27 (2d ed.) (collecting cases). Therefore, although it takes an "exceptional" case to warrant abstention on these grounds, *see* Wright, Miller & Cooper, Federal Practice and Procedure § 4246 (2d ed.), the Court finds that the present matter fits that description.

Finally, as a practical matter, the trespass claim is not the main focus of the plaintiffs' complaint against the defendants. Rather, it is clear that the primary thrust of the plaintiffs' grievance is the alleged defamatory broadcast. The undercover video that was obtained through the fraudulent entry was never published and likely never will be. The plaintiffs did not suffer any actual harm from the trespass, and, as such, there is little hanging in the balance as far as the parties are personally concerned. Yet if the Court ruled on the trespass claim (no matter the outcome), it would amount to a significant statement on New Jersey law. When there is so little at stake for the parties, the Court believes the better exercise of discretion is to abstain from making a pronouncement on a matter of state law never considered by the New Jersey courts.

The Court, therefore, will abstain from deciding the question whether fraud can vitiate a landowner's consent to permit a person to enter his land, thereby resulting in a trespass. The

plaintiffs' trespass claim will be dismissed without prejudice, and they may pursue it in the New Jersey courts.  The parties' motions for summary judgment on the merits of the trespass claim will be denied as moot.

<p style="text-align:center">B.</p>

As stated above, the proponent of a defamation claim must prove: "(1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication [(defamation per quod)]." *Mitan*, 474 Mich. at 24, 706 N.W.2d at 421.  The defendants maintain that the plaintiffs are public figures, which elevates the fault standard.  When the plaintiff is a "public figure," he must also establish that the defendant published the defamatory statement "'with "actual malice," – that is, with knowledge that it was false or with reckless disregard of whether it was false or not.'" *Herbert v. Lando*, 441 U.S. 153, 156 (1979) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964)).  *See also* Mich. Comp. Law § 600.2911(6). Whether one is a public figure is a question of law to be determined by the courts.  *Marcone v. Penthouse Int'l*, 754 F.2d 1072, 1081 n.4 (3d Cir. 1985); *see also Cobb v. Time, Inc.*, 278 F.3d 629, 637 (6th Cir. 2002) ("The unique nature of the interest protected by the actual malice standard requires that reviewing courts conduct an independent review to determine whether that standard has been met.").

<p style="text-align:center">1.</p>

Public figures include those who achieve fame "by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention." *Gertz v. Robert*

*Welch, Inc.*, 418 U.S. 323, 342 (1974). A plaintiff can be either a limited-purpose public figure or a general-purpose public figure, although sometimes this distinction is unimportant. *See Bufalino v. Detroit Magazine, Inc.*, 433 Mich. 766, 779-80, 449 N.W. 2d 410, 416 (1989). A limited-purpose public figure is a public figure with respect to "a limited range of issues," and he achieves that status by "voluntarily inject[ing] himself . . . into a particular public controversy." *Gertz*, 418 U.S. at 351. A general-purpose public figure is one who attains "such pervasive fame or notoriety that he becomes a public figure for all purpose and in all contexts." *Ibid.* Although the Court has found no Michigan case on point, it appears that a business entity – not just a natural person – can constitute a public figure under defamation law. *See, e.g., Peter Scalamandre & Sons, Inc. v. Kaufmann*, 113 F.3d 556, 560 (5th Cir. 1997).

Analyzing whether a plaintiff is a limited-purpose public figure proceeds in two stages. *Clark v. ABC, Inc.*, 684 F.2d 1208, 1218 (6th Cir. 1982) (citing *Gertz*, 418 U.S. at 345, 352). "First, a 'public controversy' must exist." *Ibid.* "Second, the nature and extent of the individual's involvement in the controversy must be ascertained." *Ibid.*

In assessing whether a public controversy exists, the Court is mindful that "all contoversies of interest to the public" are not "public controversies" within the meaning of *Gertz. Ibid.* Rather, a "public controversy" is "a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way." *Waldbaum v. Fairchild Pub., Inc.*, 627 F.2d 1287, 1296 (D.C. Cir. 1980). It is "a dispute that in fact has received public attention because its ramifications will be felt by persons who are not direct participants." *Ibid.*; *accord Lundell Mfg. Co., Inc. v. ABC, Inc.*, 98 F.3d 351, 363 (8th Cir. 1998); *Partington v. Bugliosi*, 56 F.3d 1147, 1159 n.18 (9th Cir. 1995); *Foretich v. Capital Cities/ABC, Inc.*, 37 F.3d 1541, 1554 (4th Cir. 1994).

In the second stage, the nature and extent of a plaintiff's participation in a public controversy is discerned by considering three factors: "first, the extent to which participation in the controversy is voluntary; second, the extent to which there is access to channels of effective communication in order to counteract false statements; and third, the prominence of the role played in the public controversy." *Clark*, 684 F.2d at 1218 (citing *Gertz*, 418 U.S. at 344-45, and *Wolston v. Reader's Digest Assoc., Inc.*, 433 U.S. 157, 165-68 (1979)).

With these standards in mind, the Court has little trouble concluding that the Lifestyle Lift companies qualify as limited-purpose public figures. Based on the record evidence, a reasonable jury would have no choice but to conclude that a public controversy existed prior to October 10, 2006 concerning the propriety of the Lifestyle Lift procedure. Between August 16, 2005 and March 15, 2006, three articles appeared in major newspapers discussing the pros and cons of the Lifestyle Lift procedure. The articles made specific mention of the fact that the Lifestyle Lift had its fair share of critics. In addition, extensive discussion regarding Lifestyle Lift occurred in internet chat rooms, and many of the remarks were not flattering. *See* Defs.' Mot. for Summ. J., Ex. Q, Message Board Posts. Due to the fact that this controversy centered on the safety and effectiveness of a prolific medical procedure, it was "a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way." *See Waldbaum*, 627 F.2d at 1296. According to the plaintiffs' website, over 70,000 Lifestyle Lift operations had been performed at the time of the publication; if the procedure was suspect, invalid, or dangerous, there are numerous members of the public who ought to be informed.

Further, the Lifestyle Lift companies voluntarily took a public position on the propriety of the procedure, they were savvy in their use of the media, and they took a leading role in debunking

their critics and promoting their product. Lifestyle Lift's business model is largely built on television advertising, and it has also benefitted in the past from media coverage. Indeed, Lifestyle Lift has admitted that it spent $10,000,000 on advertising over the last three years, and has been featured in approximately 100 media broadcasts. Like the plaintiff in *Steaks Unlimited, Inc. v. Deaner*, 623 F.2d 264, 274 (3d Cir. 1980), Lifestyle Lift "invited public attention, comment, and criticism" through its "advertising blitz." The voluntariness of Lifestyle Lift's participation in the controversy is established by Dr. Kent's agreement to answer criticism in an interview with reporter Cahn: Kent allowed Cahn to film a surgery to show the public the truth, and he attempted to rebut the claims of impropriety. Lifestyle Lift obviously has no difficulty using the media, and it has plenty of resources to communicate its own side of the story. The third factor also suggests that Lifestyle Lift is a limited-purpose public figure because it has played a prominent role in the controversy. Although the controversy over mini-lifts has not been confined strictly to Lifestyle Lift, it appears that Lifestyle Lift is the biggest name in the business. Lifestyle Lift, even before the October 10, 2006 broadcast, was at the center of the dispute. Therefore, since a public controversy existed prior to the defendants' broadcast and Lifestyle Lift "voluntarily inject[ed]" itself into that controversy, the Court concludes as a matter of law that the Lifestyle Lift companies are limited-purpose public figures. *See Gertz*, 418 U.S. at 351. As a result, they must show actual malice on the part of the defendants in their publication of the alleged defamatory statements. *See Herbert*, 441 U.S. at 156 (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964)); *Nichols v. Moore*, 477 F.3d 396, 399 (6th Cir. 2007).

The defendants insist that none of the five statements noted above is defamatory. Generally speaking, "a communication is defamatory 'if it tends so to harm the reputation of another as to lower him in the estimation of the community or deter third persons from associating or dealing with him.'" *Falls v. Sporting News Pub. Co.*, 834 F.2d 611, 615 (6th Cir. 1987) (quoting *Nuyen v. Slater*, 372 Mich. 654, 662, 127 N.W.2d 369, 374 (1969)). Under Michigan law, "[f]alse and malicious statements injurious to a person in his or her business are actionable per se, and special damages need not be alleged or proved." *Heritage Optical Center, Inc. v. Levine*, 137 Mich. App. 793, 797, 359 N.W.2d 210, 212 (1984).

When the contested statement does not amount to defamation per se, the plaintiff must establish "special harm" or "special injury" flowing from publication. *Mitan*, 474 Mich. at 24, 706 N.W.2d at 421. For purposes of defamation, these "terms merely refer to *actual harm* resulting from the defamatory statement." *Hall v. Citizens Ins. Co. of America*, 141 Mich. App. 676, 686, 368 N.W.2d 250, 255 (Mich. App. 1985).

Mere statements of opinion do not provide a sufficient basis for a claim of defamation. *Kevorkian v. American Medical Association*, 237 Mich. App. 1, 5, 602 N.W.2d 233, 236 (1999). However, as the Michigan Court of Appeals has observed in the useful passage set forth below, the distinction between actionable statements of fact and non-actionable statements of opinion is not always a neat one:

> A communication is defamatory if, considering all the circumstances, it tends to so harm the reputation of an individual as to lower that individual's reputation in the community or deter third persons from associating or dealing with that individual. *Ireland* [*v. Edwards*, 230 Mich. App. 607, 619, 584 N.W.2d 632 (1998)]. However, not all defamatory statements are actionable. *Ireland*, *supra*, p. 614, 584 N.W.2d 632. For example, the United States Supreme Court has rejected the idea that all

statements of opinion are protected and has directed that the defamatory statement must be provable as false to be actionable. *Id.*, p. 616, 584 N.W.2d 632, citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 17-20 (1990). In *Milkovich*, the Court by way of example distinguished the actionable statement, "In my opinion Mayor Jones is a liar," from the nonactionable statement, "In my opinion Mayor Jones shows his abysmal ignorance by acceptance the teachings of Marx and Lenin." *Ireland*, *supra*, p. 616, 584 N.W.2d 632. The Court apparently intended to distinguish between an objectively verifiable event in the former case and a subjective assertion in the latter. *Id.*, citing *Milkovich*, *supra*, pp. 21-22. Similarly, in *Ireland*, we concluded that the statement that plaintiff *Ireland* was not a fit mother was necessarily subjective and was therefore not actionable. *Id.*, p. 617, 584 N.W.2d 632. We note, however, that a statement may be necessarily subjective and also be objectively verifiable. A statement that plaintiff is a murderer, which the trial court found to be implied from defendant's statements, falls into that category.

The Supreme Court has also determined that defamatory statements, in order to be actionable, must state actual facts about a plaintiff, thereby protecting statements that, although factual on their face and provable as false, could not reasonably be interpreted as stating actual facts about the plaintiff. *Ireland*, *supra*, p. 617, 584 N.W.2d 632, citing *Milkovich*, *supra*, pp. 16-17, and *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50 (1988). Generally included as such protected speech are parodies, political cartoons, and satires. *Ireland*, *supra*, p. 617, 584 N.W.2d 632, citing *Garvelink*, *supra*, p. 610, 522 N.W.2d 883. In *Ireland*, we concluded that the statement that Ireland "never" spent time with her child was patently false and an obvious expression of disapproval of the amount of time Ireland spent with her child, but that no reasonable person would believe the statement stated actual facts about Ireland. *Ireland*, *supra*, p. 619, 584 N.W.2d 632. . . .

The Supreme Court has further recognized that statements must be viewed in context to determine whether they are capable of defamatory interpretation, or whether they constitute no more than "rhetorical hyperbole" or "vigorous epithet." *Ireland*, *supra*, p. 618, 584 N.W.2d 632, citing *Greenbelt Cooperative Publishing Ass'n, Inc. v. Bresler*, 398 U.S. 6, 14 (1970). Thus, some expressions of opinion are protected. *Ireland*, *supra*, p. 614, 584 N.W.2d 632, citing *Milkovich*, *supra*, pp. 18-20; *Hodgins v. Times Herald Co.,* 169 Mich. App. 245, 253, 425 N.W.2d 522 (1988), citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339 (1974). For example, in *Greenbelt*, *supra*, a real estate developer was involved in simultaneous negotiations with the city of Greenbelt, Maryland. Because the developer was both selling land to the city and seeking a zoning variance from the city, a local newspaper printed articles reporting that community members described his bargaining position as "blackmail." The Supreme Court rejected the developer's argument that the newspaper effectively charged him with the crime of blackmail, and concluded that "even the most careless reader must have perceived that the word [blackmail] was no more than rhetorical

> hyperbole . . . ." *Ireland*, *supra*, p. 618, 584 N.W.2d 632, citing *Greenbelt*, *supra*, p. 14.

*Id.* at 5-7. Additionally, even if statements are technically false, a claim for defamation will not exist "[a]s long as 'the substance, the gist, the sting' of the communication is true." *In re Chmura*, 464 Mich. 58, 74, 626 N.W.2d 876, 886 (2001) (quoting *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991)).

The Court finds that the plaintiffs have come forward with sufficient evidence establishing that the six statements are defamatory because they are arguably false and the plaintiffs plainly have suffered actual harm as a result of the defendants' conduct. *See Hall*, 141 Mich. App. at 686, 368 N.W.2d at 255. Indeed, many of the statements may even be defamatory per se in the sense that they are injurious to Lifestyle Lift in its capacity as a business. *Heritage Optical Center, Inc.*, 137 Mich. App. at 797, 359 N.W.2d at 212.

Of course, the plaintiff in a defamation suit bears the burden of proving falsity. *Nichols*, 477 F.3d at 400 (citing *Fisher v. Detroit Free Press, Inc.*, 158 Mich. App. 409, 404 N.W.2d 765, 767 (1987)). If a defamatory statement is "substantially true," the defendant is not liable. *Ibid.* at 399-400. "The question of whether or not the meaning of a particular communication is defamatory is one for the court." *Fisher v. Detroit Free Press, Inc.*, 158 Mich. App. 409, 413, 404 N.W.2d 765, 767 (1987). However, the determinations of falsity and actual malice are questions of fact for the jury. *See Burr's Damascus Tool Works v. Peninsular Tool Mfg. Co.*, 142 Mich. 417, 421, 105 N.W. 858, 859 (1905) ("Whether the articles were true or not was a question of fact for the jury"); *Bicheler v. Union Bank & Trust Co. of Grand Rapids*, 745 F.2d 1006, 1014 (6th Cir. 1984) ("Michigan courts have generally held that actual malice is a jury question.").

The first statement at issue is Cahn's remark that "[t]hese former patients say they did sign consent forms about the risks, but insist that they were sold and what they were sold they didn't get." Pls.' Resp. to Mot. for Summ. J. at 14 (quoting broadcast). The clear implication of this statement is that Lifestyle Lift misrepresented to patients the risks, benefits, and results of the procedure. A reasonable jury could find that it was substantially false because, whatever advertising may have occurred beforehand, the informed consent form told patients that the procedure would merely "improve some visible signs of aging to the face and neck" and would "not arrest the aging process." Resp. Br., Ex. 1-F-1, Informed Consent Form Signed by Ann T. at 1, 3. The form also stated that patients would "have a scar" (possibly a "thick," "wide," and unattractive one) and would experience symptoms such as swelling and bruising. *Id.* at 1-2. Therefore, it is the province of the jury to determine the truth or falsity of this statement.

The second disputed statement is a former patient's observation that, during the operation, "[t]hey take your skin and roll it up and stick it behind your ear." Pls.' Resp. to Mot. for Summ. J. at 14 (quoting broadcast). The defendants have relegated their analysis of this statement to a footnote, where they posit that, "[a]s a layperson's explanation of the incisions and stitching that occurred behind her ear, the statement is neither false nor defamatory." Br. in Supp. of Defs.' Mot. for Summ. J. at 9 n.2. This argument is unavailing. First, there is no rule that a layperson's description of a technical procedure is non-defamatory as a matter of law. Rather, liability may attach if the statement, however phrased, is defamatory in nature and substantially false. Here, the statement is clearly of a defamatory nature because, viewed in context, it implies that the Lifestyle Lift procedure is a form of quackery. After hearing that the procedure involved rolling the facial skin up and sticking it behind the ear, the majority of individuals interested in getting a facelift

would certainly look for another vendor. Second, there is ample evidence from which a jury could determine that the patient's description of the procedure was substantially false. The nature of the procedure, "a short-flap, variable incision SMAS-plication facelift," Resp. Br., Ex. 1, Kent Aff. at ¶ 10, is basically undisputed. It does not involve merely lifting the skin, but requires lifting and securing with sutures the facial muscle tissue *and* the overlaying skin. It does not involve any "rolling" of the skin.

The third item is Dr. Bucky's statement that the Lifestyle Lift-type procedure was "basically discarded in the 1970s because it gives only temporary results." Pls.' Resp. to Mot. for Summ. J. at 15 (quoting broadcast). There can be little question that statement is defamatory in that it accuses the plaintiffs of performing a procedure that is obsolete and frowned-upon by the medical community. There is also ample evidence to suggest that it is false. Drs. Kent and Koch both have testified unequivocally that the procedure was not discarded in the 1970s, and it is presently a generally-accepted medical procedure. They believe Dr. Bucky may have been confusing the Lifestyle Lift procedure with the "skin lift," "which *was* discarded in the 1970s." *See* Pls.' Resp. Br., Ex. 7, Koch Dec. at ¶ 17 (emphasis added). The defendants' own expert, Dr. Baker, has stated that the Lifestyle Lift procedure is a type of "mini lift," which is acceptable for "select patients" and which is "performed by qualified physicians all over the country." Pls.' Resp. Br., Ex. 8, Baker Dep. at 48-49. Further, although Dr. Bucky continues to stand by his opinion that this sort of procedure was developed in the 1970s and then fell out of favor for lack of longevity, he acknowledges that it has recently made a resurgence, and this is not just due to the activity of Lifestyle Lift.

The fourth contested statement is Dr. Bucky's opinion that, "[i]f this operation was real and truly worked, then far more qualified physicians would all be doing that." Pls.' Resp. to Mot. for

Summ. J. at 15 (quoting broadcast). This statement contains elements of verifiable fact and an opinion. The opinion is that more physicians might perform the procedure, and that remark is not objectively verifiable and therefore not actionable by itself. But the implication of this statement is two-fold: first, it suggests that the operation is in not "real" and does not produce tangible results; second, it suggests that the Lifestyle Lift physicians are not qualified. A reasonable jury could find that the statement is false. The Lifestyle Lift procedure is "real" in the sense that it entails "cutting, dissection, blood vessel control, and suture placement" – an actual cosmetic surgical procedure. In addition, the results are tangible and significant, according to Dr. Kent, although they may be less dramatic than those obtained by a traditional facelift. Furthermore, there is substantial evidence in the record tending to prove that Lifestyle Lift physicians are well qualified for the task. Kent has testified that Lifestyle Lift only affiliates with doctors who are board-certified or board-eligible in one of three relevant fields. This was confirmed by Dr. Koch. Even Dr. Baker, the plaintiff's own expert, has stated he does not believe that "qualification is an issue here."

The fifth statement at issue is Dr. Bucky's comment that the procedure "might work fine for about 5% of patients." Pls.' Resp. Br. at 15 (quoting broadcast). The defamatory quality of this statement is clear on its face: it implies that Lifestyle Lift doctors are performing gratuitous surgeries and therefore the statement has the effect of lowering Lifestyle Lift's public reputation. The record would also support a finding of substantial falsehood, since Drs. Kent and Koch both testified that the Lifestyle Lift "is appropriate for all patients who have the procedure." Pls.' Resp. Br., Ex. 1, Kent Dec. at ¶ 25; Ex. 7, Koch Dec. at ¶ 20. "This is far in excess of the 5% of facelifting patients generally and certainly for the Lifestyle Lift patients in particular. It is appropriate for facial laxity, jowls, and neck skin laxity." Pls.' Resp. Br., Ex. 1, Kent Dec. at ¶ 25; Ex. 7, Koch Dec. at ¶ 20.

Further, Dr. Baker, the defendants' expert, has testified that he believes the procedure is appropriate for those with mild neck laxity.  Although he states that only 5% of his patients fall within that category, Baker acknowledges that the Lifestyle Lift procedure, when combined with other procedures, may be appropriate for a greater number of patients.

The sixth and final statement is Dr. Bucky's comment, "In 10 years of practice I've never seen keloid scars or sutures coming through."   Pls.' Resp. to Mot. for Summ. J. at 16 (quoting broadcast).  Dr. Bucky made this comment after viewing photos of former Lifestyle Lift patients' scars, and the statement effectively accuses the doctors who performed those surgeries of substandard practice.  Courts frequently have held that defamation claims may be premised on false accusations of medical malpractice, *see, e.g., Entravision Comm. Corp. v. Belalcazar*, 99 S.W.3d 393 (Tex. Ct. App. 2003), and it is clear that Dr. Bucky's statement tends to harm the reputation of Lifestyle Lift.  Accordingly, the statement is defamatory in nature.  *See Falls*, 834 F.3d at 615.  In addition, there is sufficient evidence to support a jury's conclusion of substantial falsehood.  Dr. Bucky himself stated that "in all fairness," keloid scars can occur with even the best surgeon, Pls.' Resp. Br., Ex. HH, Video of Bucky Interview, although that portion of the interview was not included in the broadcast.   Dr. Kent echoed this sentiment: "As I informed Ms. Cahn, hypotropic/keloid scars occur to the best surgeon, using the most skill, and are a risk in all surgery because they are unpredictable and occur without any fault on the part of the surgeon performing the procedure."  Pls.' Resp. Br., Ex. 1, Kent Dec. at ¶ 26.  With respect to the possibility of a suture coming through, Kent says that "it is discussed in the medical literature and disclosed on the Lifestyle Lift consent form," and it is a rare occurrence.  *Ibid.*  To the extent that Bucky's statement suggested malpractice, a jury could find this was a false accusation.

The Court concludes, therefore, that material fact issues exist on the question of the falsity of the six statements either because they are subject to objectively verifiable contrary facts or their implications encompass factual assertions that are objectively refutable by the evidence in the record. *See American Transmission, Inc.*, 239 Mich. App. at 702 ("A cause of action for defamation by implication exists in Michigan, but can succeed only if the plaintiff proves that the defamatory implications are materially false.").

3.

Turning to the issue of actual malice, the inquiry is whether a reasonable jury could find clear and convincing evidence that the defendants published the above statements with knowledge that they were false or with reckless disregard of whether they were false or not. *Herbert*, 441 U.S. at 156; *Nichols*, 477 F.3d at 399. "Clear and convincing evidence" is evidence suggesting that "the truth of the contention is highly probable, as opposed to more likely than not." *Disner v. Westinghouse Elec. Corp.*, 726 F.2d 1106, 1111 (6th Cir. 1984). The Sixth Circuit has explained: "'[W]here the non-moving party faces a heightened burden of proof, . . . he must show in opposition to the motion for summary judgment that he can produce evidence which, if believed, will meet the higher standard.'" *Inge v. Rock Financial Corp.*, 388 F.3d 930, 938 (6th Cir. 2004) (quoting *Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1444 (6th Cir. 2003)). However, that heightened burden does not diminish a jury's role in the decisional process, especially when determining credibility issues. *See, e.g., Buchko v. City Hosp. Ass'n*, 76 F.3d 378, *7 (6th Cir. 1996) (Table) ("The issue essentially would be one of credibility. If Buchko's testimony were believed – that false and serious accusations of misconduct violative both of law and hospital policy were made to her employer – we think a jury rationally could accept this as clear and convincing evidence that they

were made with actual malice.").  If factual issues exist on the question of the defendants' level of

knowledge of the falsity of the defamatory statements, summary judgment is not appropriate.

With respect to the first statement, Dr. Kent has testified that he informed Cahn during their

pre-broadcast discussions "that the patients review the risks and benefits of the procedure with both

the consultants and surgeons prior to undergoing the procedure and execute informed consent

forms."  Pls.' Resp. Br., Ex. 1, Kent Dec. at ¶ 21.  Kent states he also told Cahn that scarring was

a disclosed risk of the procedure.  If a jury credited this testimony, it reasonably could conclude that

Cahn acted with actual malice when she published the statement suggesting that Lifestyle Lift

misrepresented the risks and benefits of the procedure to patients.

As for the second statement, a patient's remark that "[t]hey take your skin and roll it up and

stick it behind your ear," sufficient evidence of malice can be found from the evidence that Cahn

watched a procedure prior to the broadcast and listened to Dr. Kent explain the procedure.  Based

on this evidence, a jury easily could find that Cahn knew the patient's description was grossly

inaccurate.

A jury could also find actual malice in the publication of the third statement.  Although it is

unclear whether Cahn directly questioned Dr. Kent regarding Dr. Bucky's assertion that the

"Lifestyle Lift was basically discarded in the 1970s because it gives only temporary results," Kent

did explain to Cahn that the Lifestyle Lift procedure "is not a temporary procedure, anymore than

a traditional facelift is a temporary procedure."  Pls.' Resp. Br., Ex. 1, Kent Dec. at ¶ 23.  Combined

with Dr. Bucky's testimony that the present decade has seen the re-emergence of the Lifesyle Lift-

type procedure, *see* Defs.' Mot. for Summ. J., Ex. CC at 199, a jury could infer that the defendants,

and Cahn in particular, acted with reckless disregard for the truth.

The fourth statement suggests that the Lifestyle Lift is ineffective and that the doctors who perform it are not qualified. However, Kent testified he told Cahn that "the great majority of patients will see a positive result in their appearance from the procedure." Pls.' Resp. Br., Ex. 1, Kent Dec. at ¶ 24. He also told her that the Lifestyle Lift is a "generally accepted medical procedure which works from a medical standpoint." *Ibid.* In addition, Kent informed Cahn that the Lifestyle Lift companies only affiliated with doctors who were board-certified or eligible for board certification in one of three related fields, and Cahn acknowledged this representation on the broadcast. Dr. Bucky told Cahn that "maybe one or two" of the Lifestyle Lift physicians were board-certified. Defs.' Mot. for Summ. J., Ex. HH, Video of Bucky Int. The evidence suggests Cahn knew this representation was inaccurate, and yet she chose to publish Dr. Bucky's unverified statement regarding a lack of qualification despite the contrary information.

With respect to the fifth statement, that the Lifestyle Lift procedure is appropriate for 5% of patients, evidence of malice can be found in Dr. Kent's testimony that he told Cahn the procedure was "appropriate for all patients who have the procedure." Pls.' Resp. Br., Ex. 1, Kent Dec. at ¶ 25. In addition, Cahn acknowledged in her deposition that the number of complaining patients of whom she was aware was slight in comparison to the number of total patients. Although Cahn has stated that she had no reason to disbelieve Dr. Bucky's opinion in light of his reputation as a distinguished physician, a jury would be entitled to discredit this testimony.

The sixth statement (Dr. Bucky's comment that, "In 10 years of practice I've never seen keloid scars or sutures coming through"), which, as discussed above, implies malpractice by the Lifestyle Lift physicians, is contradicted by Bucky's statement to Cahn during his interview that keloid scars can occur with even the best surgeon, and Kent's statement to her that scarring was an

inherent (and disclosed) risk. Because Cahn had this information before she published the report, a jury could find that the defendants published this statement with actual knowledge that its defamatory implication was false or with reckless disregard as to whether it was false or not.

Other indicia of actual malice can be found in Cahn's interview of Dr. Bucky. On at least one occasion, it appears that Cahn materially exaggerated Lifestyle Lift's representations to prospective patients. She said to Bucky, "you come in, they pull your face back, and they tell you this is what you're going to look like, and you're out in an hour, [and] you're going to be partying tonight." Defs.' Mot. for Summ. J., Ex. HH, Video of Bucky Interview. When she asked Bucky what he thought about this type of advertising, Bucky stated that although he thought it was reasonable for Lifestyle Lift to claim patients could be out that night, he wondered "who would want [a patient] to be out partying that night?" *Ibid.* He explained: "There's something wrong with somebody telling you that to begin with." *Ibid.* However, the Court finds no evidence that Lifestyle Lift personnel ever told patients they could go out "partying" on the same day as the procedure.

The Court concludes that the foregoing proof put forth by the plaintiff, if believed by the jury, amounts to clear and convincing evidence that the defendants published the six statements knowing that they were false or with reckless disregard of their falsity. Summary judgment on the defamation count, therefore, will be denied.

III.

The Court approved the parties' protective order, which authorized each party to designate certain documents as confidential. The parties did so and filed many of the confidential-designated documents under seal in support of their respective positions on the dispositive motions. The plaintiffs now seek to maintain the confidential status of various documents and deposition

testimony submitted by the defendants in support of their motion for summary judgment, and whose designation as confidential has been challenged by the defendants. The documents at issue are as follows: LSL NBC DOC PROD 1524-1525; 1538-1540; 2616-2618; 5562; 6256-6258; 6269; 6274; 6277; 6318-6320; 6335;[1] 6443-6444; 6477; 6482-6487; 6492-6497; 6511-6512; 6524; 6531; 6673;[1] 6688-6689; 6964-6965; 7012; 7229-7230; 7256; 7298; 7303; 7431-7441; and 7448-7453. Mot. to Maintain Conf. at ¶ 11. The contested deposition testimony and exhibits consist of: (1) Marc Belanger's testimony from line 12 of page 78 to line 20 of page 81 and from line 4 to line 25 of page 94, as well as exhibit 15 attached thereto; (2) exhibit 19 corresponding to Dr. Kent's deposition; (3) Mike Smith's deposition testimony from line 8 of page 22 to line 9 of page 23 and from line 18 to line 23 of page 149, as well as exhibit 8 attached thereto; and (4) exhibit 3 corresponding to Kellie Young's deposition. *Ibid.* According to the plaintiffs, good cause exists to keep all of these materials confidential because they contain either trade secrets or patient information amounting to "individually identifiable health information" (IIHI) protected by the Health Insurance Portability and Accountability Act (HIPAA), 42 U.S.C. § 1320d *et seq.*

The defendants submit that the plaintiffs have failed to offer compelling reasons for denying public access to the materials at issue. They argue that there is a strong presumption in favor of public access, which can only be overcome with "compelling reasons," not just good cause. They also maintain that they have offered to redact the IIHI from the documents containing patient information.

---

[1] The plaintiffs actually have listed 6355 and 6573, respectively, as the documents at issue, but the Court cannot find those page numbers anywhere in the defendants' motion for summary judgment. Page numbers 6335 and 6673, on the other hand, clearly contain IIHI and were challenged by the defendants, so the Court presumes the plaintiffs meant to refer to those documents.

The Sixth Circuit has stated that there is a "strong common law presumption in favor of public access to court proceedings and records." *Brown & Williamson Tobacco Corp. v. F.T.C.*, 710 F.2d 1165, 1179 (6th Cir. 1983). *See also Proctor & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 227 (6th Cir. 1996). A party seeking to overcome this presumption must show "compelling reasons" for denying public access. *In re Perrigo Co.*, 128 F.3d 430, 446 (6th Cir. 1997); *In re Knoxville News-Sentinel Co., Inc.*, 723 F.2d 470, 476 (6th Cir. 1983); *see also Brown & Williamson*, 710 F.2d at 1180. "Simply showing that the information would harm the company's reputation" is not sufficient. *Brown & Williamson*, 710 F.2d at 1179.

On the other hand, the presumption in favor of public access may be overcome when trade secrets are implicated. *In re Perrigo Co.*, 128 F.3d at 446. Federal Rule of Civil Procedure 26(c)(1)(G) recognizes this explicitly, stating that a protective order may be entered providing "that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way." Fed. R. Civ. P. 26(c)(1)(G). To qualify as a trade secret, "information must (1) derive economic value from the fact that it is not known to others who could make use of it, and (2) be the subject of efforts that are reasonable under the circumstances to maintain its secrecy." *Mike's Train House, Inc. v. Lionel, LLC*, 472 F.3d 398, 410 (6th Cir. 2006). The Sixth Circuit has held that maintaining materials under seal is appropriate when public access would infringe the privacy interests of innocent third parties "who were not responsible for the initiation of the underlying litigation." *In re Knoxville*, 723 F.3d at 477.

In addition to the presence of trade secrets and other commercially-sensitive information, the plaintiffs argue that certain material should be kept under seal pursuant to HIPAA, Pub L. 104-191, 110 Stat. 1936. "Recognizing the importance of protecting the privacy of health information

in the midst of the rapid evolution of health information systems, Congress passed HIPAA in August 1996." *South Carolina Med. Ass'n v. Thompson*, 327 F.3d 346, 348 (4th Cir. 2003). Among other things, HIPAA ushered in special rules governing the disclosure of "individually identifiable health information," or IIHI. *See Citizens for Health v. Leavitt*, 428 F.3d 167, 172 (3d Cir. 2005). The relevant provisions, which make up the so-called "privacy rule," *id.* at 171, were promulgated by the Department of Health and Human Services and can be found in 45 C.F.R. pts. 160 and 164. The privacy rule prohibits "covered entities" (generally health care providers who transmit health information in electronic form, *see* 45 C.F.R. § 160.103) from using or disclosing an individual's "protected health information" except where there is patient consent or the use or disclosure is for "treatment, payment, or health care operations," *see* 45 C.F.R. §§ 164.502(a), 164.506. *See also Leavitt*, 428 F.3d at 173. "Protected health information" is "individually identifiable health information" that is transmitted or maintained in electronic form or otherwise. 45 C.F.R. § 160.103. "Individually identifiable health information" is in turn defined as follows:

> Individually identifiable health information is information that is a subset of health information, including demographic information collected from an individual, and:
>
> (1) Is created or received by a health care provider, health plan, employer, or health care clearinghouse; and
>
> (2) Relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual; and
>
> (i) That identifies the individual; or
>
> (ii) With respect to which there is a reasonable basis to believe the information can be used to identify the individual.

45 C.F.R § 160.103.

Due to the parties' failure to identify the location of the disputed materials in the record, the task of tracking down those materials was quite onerous and prolonged the resolution of these motions. After having located the documents, the Court finds that maintaining most of them under seal is unwarranted.

However, two of the disputed documents should remain under seal because public access would infringe upon the privacy interests of innocent third parties, i.e., former employees. These documents are LSL NBC DOC PROD 6443-6444. The plaintiffs' motion will be granted with respect to these documents.

As for the documents allegedly containing IIHI, there is no merit to the plaintiffs' refusal to the defendants' offer to unseal such material following redaction of the identifying information. Certainly the documents contain IIHI as defined by 45 C.F.R § 160.103. But redaction is a sensible solution and will protect the privacy of the patients. Therefore, the Court will deny the plaintiffs' motion with respect to the following documents (subject to appropriate redaction): LSL NBC DOC PROD 1524-1525, 1538-1540 (patient complaint letters to Lifestyle Lift); 5562, 6255-6258, 6269, 6274, 6277, 6318-6320, 6335; and 6673 (intra-company email exchange regarding patient's cancelled surgery).

The plaintiffs' motion to maintain confidentiality also will be denied with respect to the following materials because they do not contain trade secrets as defined by *Mike's Train House, Inc. v. Lionel*: LSL NBC DOC PROD 6492-6497 (contains unremarkable information re sales and surgery rates that cannot reasonably be construed as trade secrets or other commercially sensitive information); 6511-6512 (same); 6524 (information re garden-variety employee promotions to encourage sales that cannot reasonably be construed as trade secrets or other commercially sensitive

information); 6531 (same); 6688-6689 (email exchange re how to discourage "gun-shy" patients from cancelling that cannot reasonably be construed as containing trade secrets or other commercially sensitive information); 6964-6965 (email exchange re sales benchmarks that cannot reasonably be construed as containing trade secrets or other commercially sensitive information); 7012, 7229-7230, 7256, 7298 (same); 7431-7441 (email discussion and charts regarding sales and surgery rates that cannot reasonably be construed as trade secrets or other commercially sensitive information); 7448-7453 (same); 2616-2618 (payroll summary chart containing wage rates that cannot reasonably be construed as trade secrets or other commercially sensitive information); 7303 (email regarding termination of affiliate's relationship with Lifestyle Lift that cannot reasonably be construed as containing trade secrets or other commercially sensitive information); 6482-6487 (charts re sales and surgery rates in various offices that cannot reasonably be construed as containing trade secrets or other commercially sensitive information); Marc Belanger's testimony from line 12 of page 78 to line 20 of page 81 and from line 4 to line 25 of page 94 (offering testimony regarding pay structure of call center representatives that cannot reasonably be construed as containing trade secrets or other commercially sensitive information); Exhibit 15 to Belanger's deposition (Lifestyle Lift Call Center Training Manual containing nothing but the most standard of instructions (e.g., build rapport, be positive, etc.)); Ex. 19 to Dr. Kent's deposition (intra-office email exchanges regarding advertising efforts that cannot reasonably be construed as containing trade secrets or other commercially sensitive information); Mike Smith's deposition testimony from line 8 of page 22 to line 9 of page 23 and from line 4 to line 25 of page 94 (offering testimony regarding Lifestyle Lift's advertising budget and the fact that patients are paid to appear in infomercials); exhibit 3 to Kellie

Young's deposition (Lifestyle Lift Consultant Manual containing unremarkable instructions and basic information concerning the consultation protocol).

The plaintiffs state that the defendants have also challenged the confidential designation of LSL NBC DOC PROD 6477 and exhibit 8 to Mike Smith's deposition, which the defendants supposedly offered in support of their motion for summary judgment. However, the Court has not been able to find those materials anywhere in the defendants' motion or the plaintiffs' submissions.

With the exceptions noted above, the plaintiffs' motion to maintain confidentiality of the designated documents will be denied.

IV.

The Court concludes that it ought to abstain from deciding the plaintiffs' claim based on trespass, and therefore neither the defendants' motion for summary judgment or dismissal of that claim on the merits nor the plaintiffs' motion for summary judgment will be granted. The Court also finds that fact issues preclude summary judgment for the defendants on the defamation claim. The plaintiffs' motion to maintain the confidentiality of certain documents filed under seal will be denied, except that documents containing patient information must be redacted to eliminate individually identifiable health information, and the documents containing information relating to former employees will remain under seal. It appears that discovery is complete and the case is now ready for trial. Therefore, the Court will assign dates for the completion of the action.

Accordingly, it is **ORDERED** that the defendants' motion for summary judgment [dkt #107] is **DENIED**.

It is further **ORDERED** that the plaintiffs' motion for summary judgment [dkt #139] is **DENIED**.

It is further **ORDERED** that the plaintiffs' motion to maintain confidentiality of certain documents filed under seal [dkt #134] is **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that count two of the complaint alleging trespass to land is **DISMISSED WITHOUT PREJUDICE**.

It is further **ORDERED** that the following documents shall remain under seal: LSL NBC DOC PROD 6443-6444.

It is further **ORDERED** that the following documents will be unsealed: LSL NBC DOC PROD 1524-1525; 1538-1540; 2616-2618; 5562; 6256-6258; 6269; 6274; 6277; 6318-6320; 6335; 6477; 6482-6487; 6492-6497; 6511-6512; 6524; 6531; 6673; 6688-6689; 6964-6965; 7012; 7229-7230; 7256; 7298; 7303; 7431-7441; 7448-7453; Marc Belanger's testimony from line 12 of page 78 to line 20 of page 81 and from line 4 to line 25 of page 94, as well as exhibit 15 attached thereto; exhibit 19 corresponding to Dr. Kent's deposition; Mike Smith's deposition testimony from line 8 of page 22 to line 9 of page 23 and from line 18 to line 23 of page 149, as well as exhibit 8 attached thereto; and exhibit 3 corresponding to Kellie Young's deposition; PROVIDED, however, that the plaintiffs shall redact from these documents information that reasonable could be construed to constitute individually identifiable health information.

It is further **ORDERED** that trial by jury shall begin on **August 5, 2008** at **8:30 a.m.**

It is further **ORDERED** that the parties shall appear for a final pretrial conference on **June 11, 2008** at **12:00 p.m.**

It is further **ORDERED** that the parties shall submit to chambers a proposed joint final pretrial order on or before **June 4, 2008**.

It is further **ORDERED** that motions *in limine* shall be filed on or before **May 14, 2008**.

It is further **ORDERED** that the provisions of the Case Management and Scheduling Order not modified by this opinion and order shall remain in full force.

                                        s/David M. Lawson
                                        DAVID M. LAWSON
                                        United States District Judge

Dated:   April 28, 2008

<div style="border:1px solid black">

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on April 28, 2008.

                s/Felicia M. Moses
                FELICIA M. MOSES

</div>